IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANTHONY SOLOMON, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NO.  05-05326 |
| | : | |
| v. | : | |
| | : | |
| PHILADELPHIA NEWSPAPERS, INC. | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM**

Giles, J.                                                              May 21, 2008

**I.  Introduction**

Before the court is Defendant Philadelphia Newspaper, Inc.'s ("PNI")[1] Motion for

Summary Judgment.  In the remaining counts of Plaintiff Anthony Solomon's Amended

Complaint, Plaintiff brings suit against Defendant PNI pursuant to 42 U.S.C. § 1981 (Count I)

and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa.C.S. § 951, et seq. (Count III),[2]

both for alleged employment discrimination based on race and retaliation for engaging in a

protected activity.

Defendant's Motion for Summary Judgment is granted herein for the reasons that follow.

_____

[1]  Defendant asserts that its correct name is Philadelphia Newspapers, LLC ("PNL") and
that it was formerly known as PNI.  (Def.'s Mem. of Law in Supp. of its Mot. for Summ. J. 1.)
For ease of reference to the Amended Complaint, the court refers to Defendant as PNI.

[2]  To the extent that Count III also alleges a violation of "EEOC Section VIII," such claim
is not cognizable as a matter of law.  Although it is unclear to what "EEOC Section VIII" refers,
it may refer to a volume of the Equal Employment Opportunity Commission's Compliance
Manual on retaliation, which cannot be a cause of action against PNI.  See EEOC Compliance
Manual, Section 8: Retaliation, No. 915.003 (May 20, 1998).
In his Amended Complaint, Plaintiff does not bring any claim pursuant to Title VII of the
Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., against PNI.

The court finds that some of Plaintiff's PHRA claims are procedurally barred.  As to Plaintiff's

§ 1981 and remaining PHRA claims, the court concludes that Plaintiff has failed to establish a

prima facie case of discrimination or retaliation.  Assuming *arguendo* that Plaintiff could

establish a prima facie case, the court concludes that Plaintiff has failed to establish that the

reasons advanced by PNI as legitimate and nondiscriminatory were a pretext for discrimination

or retaliation.


## II.  Factual Background

Consistent with Fed. R. Civ. P. 56, the alleged facts in the light most favorable to the

non-moving party follow.  Unless otherwise noted, the following facts are undisputed.[3]  (See

Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J. (hereinafter "Pl's Mem.") 1-2.)


### A.     Plaintiff's Work History At PNI.

In 1980, PNI hired Plaintiff, an African-American male, as a paperhandler to work at its

Broad Street facility in Philadelphia, Pennsylvania.  (Def.'s Mem. of Law in Supp. of its Mot. for

Summ. J., Ex. (hereinafter "Def.'s Ex.") B, Pl. Dep. at 16-17.)  At that time, Plaintiff reported to

his work leader, William Kelly, and the department manager, Al Haines, both with whom

Plaintiff got along well.  (Def.'s Ex. B, Pl. Dep. at 17-18.)

In 1990, Plaintiff transferred to PNI's Schuylkill printing plant.  (Def.'s Ex. B, Pl. Dep. at

19-20.)  After spending a short period of time training on the first shift, Plaintiff worked on the

---

[3]  In his response to Defendant's Motion for Summary Judgment, Plaintiff accepted as
true the majority of Defendant's statement of undisputed facts, but provided a time-line of
events.  (Pl.'s Mem. 1-3.)

third shift as a paperhandler.  (Def.'s Ex. B, Pl. Dep. at 19-20.)  The third shift schedule was initially from 11:00 a.m. to 7:00 p.m., but after about a year it changed to 9:00 p.m. to 5:00 a.m. (Def.'s Ex. B, Pl. Dep. at 20.)  Plaintiff reported to department managers Mike Flag and Bud Seixas, both with whom Plaintiff got along well.  (Def.'s Ex. B, Pl. Dep. at 21.)  Within a year of transferring to the Schuylkill facility, PNI promoted Plaintiff to the position of control room operator, which position paid an additional $100.00 per week, because Plaintiff was the most senior employee interested in the position.  (Def.'s Ex. B, Pl. Dep. at 25-26, 31.)

In 1993, Plaintiff assumed an "added responsibility" as the third shift's "work leader," and supervised the shift when other supervisors were on vacation or when no other supervisor was scheduled to work.  (Def.'s Ex. B, Pl. Dep. at 27.)  The work leader received approximately an additional $15.00 per shift.  (Def.'s Ex. D, Brown Dep. at 15.)

Throughout his PNI employment, Plaintiff was a member of Warehouse Employees Union Local 169 ("Local 169"), and played an active role in that union for several years.  (Def.'s Ex. B, Pl. Dep. at 22-23.)  From 1984 to 1990, Plaintiff was the sergeant at arms for Local 169. (Def.'s Ex. B, Pl. Dep. at 23.)  In 1990, the union members elected him to serve as shop steward. (Def.'s Ex. B, Pl. Dep. at 24.)  He served as shop steward until about 2000, having been elected once in a contested election, once elected unopposed, and once appointed.  (Def.'s Ex. B, Pl. Dep. at 23-24.)  Although Plaintiff occasionally took on the "added responsibility" function and served as work leader, the work leader position was designated as a non-management union position.  (Def.'s Ex. B, Pl. Dep. at 29.)

Prior to December 2001, Plaintiff did not have problems with anyone at PNI other than a "few very minor" problems with Fred Lombardo, a Caucasian male, who at the time was

supervisor of the second shift.  (Def.'s Ex. B, Pl. Dep. at 36, 38, 40, 50.)  These problems related

to allocation of work between the second and third shifts and, in one instance, Lombardo's

alleged failure to secure a replacement person for the third shift when Plaintiff was work leader.

(Def.'s Ex. B, Pl. Dep. at 36, 39-41.)  Although Plaintiff believes that his problems with

Lombardo were race-related, Plaintiff admits that Lombardo never made any form of racial

statement toward him and that Plaintiff never reported any of his problems with Lombardo to

PNI's human resources department.  (Def.'s Ex. B, Pl. Dep. at 43, 53.)  Plaintiff also admitted

that he did not have any problems with the Director of Printing, James Brown.  (Def.'s Ex. B, Pl.

Dep. at 136.)  Plaintiff admitted that during his PNI employment, he never personally heard any

PNI employee make a racial statement toward him.[4]  (Def.'s Ex. B, Pl. Dep. at 109, 129.)

PNI asserts, and Plaintiff apparently disputes, that PNI has a policy against discrimination

and harassment.  (See Pl.'s Mem. 1-2; Def.'s Mem. 6.)  Nevertheless, the record is clear that

Plaintiff admitted that he knew that employees were supposed to report any complaints to

discrimination or harassment to PNI's human resources department, that he had seen PNI's work

rules, at least in part, posted at the Schuylkill Plant, and that he knew that PNI had a rule on

employee relations that prohibited disruptive behavior.  (Def.'s Ex. B, Pl. Dep. at 52-58.)

**B.**     **The December 18, 2001 Incident.**

On December 18, 2001, Plaintiff was working as the third shift's "work leader."  (Def.'s

Ex. B, Pl. Dep. at 63.)  At 3:30 a.m., as employees were leaving because they had finished their

---

[4]  Plaintiff claims that about twenty years ago, he heard some non-management
employees make a racist statement about other employees, but that he did not report the
statement.  (Def.'s Ex. B, Pl. Dep. at 129-31.)

work early, Plaintiff went into the break room, approached William Gagliardi, and told him to dump three tubs of waste from the printing presses before he could leave.  (Def.'s Ex. B, Pl. Dep. at 63-65.)  Shortly thereafter, Plaintiff claims that he heard Gagliardi in the room with the tubs cursing and screaming, and that when Plaintiff entered the room, Gagliardi approached him and screamed and cursed in his face.  (Def.'s Ex. B, Pl. Dep. at 66-67.)  Plaintiff states that he told Gagliardi, "if you don't want to work at this plant, when you leave here, don't come back." (Def.'s Ex. B, Pl. Dep. at 67.)

According to Plaintiff, Gagliardi told Plaintiff that he was going to wait for him outside. (Def.'s Ex. B, Pl. Dep. at 67.)  Plaintiff replied, "don't bother waiting, I'm right behind you." (Def.'s Ex. B, Pl. Dep. at 67; Def.'s Ex. E, Brennan Decl. ¶ 6 & Ex. 3 to Brennan Decl. (entitled "Tony Solomon's version of incident as reported to Heather Farrell on 1/7/02").)  Plaintiff followed Gagliardi outside and asked the security guard near the exit to accompany them. (Def.'s Ex. B, Pl. Dep. at 68.)  According to Plaintiff, Gagliardi continued to scream profanities at him and then walked away.  (Def.'s Ex. B, Pl. Dep. at 69; Def.'s Ex. E, Brennan Decl. ¶ 6 & Ex. 3 to Brennan Decl.)  Plaintiff admits that Gagliardi did not use any racial terms during the incident.  (Def.'s Ex. B, Pl. Dep. at 109.)  Plaintiff requested the security guard to report the incident.  (Def.'s Ex. B, Pl. Dep. at 69.)

Security reported the incident to management the next day.  (Def.'s Ex. E, Brennan Decl. ¶ 5 & Ex. 2 to Brennan Decl. (Incident report of Officer Leonard Leach).)  James Brown, the Director of Printing, and Heather Brennan, of PNI's human resources department, investigated the incident.  (Def.'s Ex. D, Brown Dep. at 6, 17-18.)  Brown and Brennan met with Plaintiff and Gagliardi.  (Def.'s Ex. D, Brown Dep. at 18-19; Def.'s Ex. F, Brennan Dep. at 8.)  Brennan also

met with the security officer, Leonard Leach, who was on duty when the incident occurred. (Def.'s Ex. F, Brennan Dep. at 8.)  Plaintiff reported the incident as described above.  (Def.'s Ex. E, Brennan Decl. ¶ 6 & Ex. 3 to Brennan Decl.)  Plaintiff claims that, the week before this incident, he had had a problem with Gagliardi regarding the emptying of containers, but that Plaintiff reported this incident to a supervisor, Phil Molineaux, who handled it.  (Def.'s Ex. B, Pl. Dep. at 75.)

Gagliardi's version of events differed to some degree.  He claimed that he began cursing when he tripped.  (Def.'s Ex. E, Brennan Decl. ¶ & Ex. 4 to Brennan Decl. ("Gagliardi's version of the incident as reported to Heather Farrell on 1/7/02").)  Gagliardi claimed that he complained to Plaintiff about why Plaintiff was making him and another employee work so hard, and that then he and Plaintiff began screaming and cursing at each other.  (Def.'s Ex. E, Brennan Decl. ¶ & Ex. 4 to Brennan Decl.)  Gagliardi stated that he asked Plaintiff if he wanted to take it outside, to which Plaintiff allegedly responded, "I'm right here motherfucker, what are you going to do?" (Def.'s Ex. E, Brennan Decl. ¶ & Ex. 4 to Brennan Decl.)  Gagliardi stated that Plaintiff then requested that a security guard follow them.  (Def.'s Ex. E, Brennan Decl. ¶ & Ex. 4 to Brennan Decl.)  When Gagliardi started walking outside, he claimed that Plaintiff said, "Where are you going, motherfucker?"  (Def.'s Ex. E, Brennan Decl. ¶ & Ex. 4 to Brennan Decl.)  Gagliardi claimed that Plaintiff and he continued their verbal confrontation and then Gagliardi left, believing the incident was over.  Gagliardi stated that Plaintiff then requested that a security guard follow them.  (Def.'s Ex. E, Brennan Decl. ¶ & Ex. 4 to Brennan Decl.)

Brown and Brennan credited Plaintiff's version of events.  (Def.'s Ex. D, Brown Dep. at 19-20, 23; Def.'s Ex. F, Brennan Dep. at 14-15.)  Brown suspended Gagliardi for thirteen days

without pay.  (Def.'s Ex. D, Brown Dep. at 20, 68.)  Gagliardi also received a written warning

documenting his suspension without pay and providing that any further incidents would result in

further disciplinary action up to and including termination.  (Def.'s Ex. C, Pl. Dep. Ex. 4 (Mem.

to Gagliardi).)  Brown and Brennan did not discipline Plaintiff, but believed that Plaintiff should

not have contributed to the incident by stating, "don't bother, I'm right behind you," and

following Gagliardi outside.  (Def.'s Ex. D, Brown Dep. at 19-20; Def.'s Ex. F, Brennan Dep. at

12, 14-15.)  Because Brown concluded that Plaintiff had not handled the situation well, he

decided to remove temporarily Plaintiff's "added responsibility" function.  (Def.'s Ex. D, Brown

Dep. at 24; Def.'s Ex. F, Brennan Dep. at 12, 18; Def.'s Ex. C, Pl. Dep. Ex. 4 (Mem. to

Solomon).)  Brown also recommended that Plaintiff contact PNI's Employee Assistance Program

("EAP"), which offers counseling services to employees, including for anger management,

family matters, substance abuse, and other issues.  (Def.'s Ex. D, Brown Dep. at 20-22; see

Def.'s Ex. B, Pl.'s Dep. 158.)  Plaintiff was allowed to continue in his position of control room

operator.  (Def.'s Ex. D, Brown Dep. at 32.)

Under the governing collective bargaining agreement between PNI and Local 169, Brown

could not transfer Plaintiff or Gagliardi, both union members, to different shifts because shift

assignments were made through a seniority-based bidding process.  (Def.'s Ex. D, Brown Dep. at

27.)  Because Brown wanted to ensure that the incident did not repeat itself or escalate, he

reassigned a supervisor to the third shift on which Plaintiff and Gagliardi worked.  (Def.'s Ex. D,

Brown Dep. at 24, 27-28.)  Brown decided to have additional employees trained for the "added

responsibility" function for times when a supervisor was not available to cover the third shift and

also so that the same person would not be serving both as a control room operator and the "added

responsibility" leader.  (Def.'s Ex. D, Brown Dep. at 24-25, 27-28, 30-31.)

Plaintiff regarded the removal of the "added responsibility" function as a demotion.  On March 5, 2002, he filed a complaint of race discrimination with the Pennsylvania Human Relations Commission ("PHRC").  (Def.'s Ex. C, Pl. Dep. Ex. 5.)  His complaint alleged that the removal of the "added responsibility" function was discriminatory because a Caucasian employee, Dennis Friel, was chosen to receive training to handle the "added responsibility" function and take away what Plaintiff characterized as his position.  (Def.'s Ex. C, Pl. Dep. Ex. 5.)

Although this allegation was not included in Plaintiff's PHRC complaint, Plaintiff further claims that Santiago Marti, a co-worker, informed him that Friel stated that he did not want to be trained by that "nigger," referring to Plaintiff.  (Def.'s Ex. B, Pl. Dep. at 127-28, 131; Def.'s Ex. C, Pl. Dep. Ex. 5.)  Plaintiff characterizes Marti as a person who fabricates stories, but chose to believe him about Friel's alleged statement.  (Def.'s Ex. B, Pl. Dep. at 128-29.)  Plaintiff admits that he never heard Friel make a racial statement.  (Def.'s Ex. B, Pl. Dep. at 129.)  There is no record of Friel's alleged statement having been reported to PNI management.

The PHRC investigated Plaintiff's complaint and, on February 2, 2003, entered a finding of "no probable cause."  (Def.'s Ex. B, Pl. Dep. at 172; Def.'s Ex. C, Pl. Dep. Ex. 12.)  The PHRC concluded that PNI had a legitimate non-discriminatory reason for its decision to remove the "added responsibility" function from Plaintiff, and noted that PNI wanted to reduce the hostility between Plaintiff and Gagliardi, consistent with its management prerogative.  (Def.'s Ex. C, Pl. Dep. Ex. 12.)  On March 21, 2003, the PHRC issued a letter dismissing Plaintiff's complaint.  (Def.'s Ex. G.)

Plaintiff admits that he cannot identify any other "work leader" who was involved in a similar verbal altercation with an employee on his shift.  (Def.'s Ex. B, Pl. Dep. at 112.)  Plaintiff did not ask Local 169 to file a grievance over the removal of his "added responsibility" function.  (Def.'s Ex. B., Pl. Dep. at 124.)

**C.      Missing Overtime Pay.**

On July 5, 2002, Plaintiff worked an overtime shift.  (Def.'s Ex. B, Pl. Dep. at 114.)  A supervisor, Thomas Addison, informed Plaintiff that he would record Plaintiff's overtime shift.  (Def.'s Ex. B, Pl. Dep. at 114.)  When Plaintiff received his pay the following week, he noticed that the compensation for his overtime shift was not included.  (Def.'s Ex. B, Pl. Dep. at 115.)  Plaintiff reported his missing overtime to Addison, who corrected the problem.  (Def.'s Ex. B, Pl. Dep. at 115.)   Plaintiff received the overtime pay in his next weekly paycheck.  (Def.'s Ex. B, Pl. Dep. at 120-21.)

Plaintiff formed the belief that another union employee, Paul Rosato, had gone into the payroll system, improperly accessed his PNI payroll records, using his supervisor Lombardo's password, and deleted Plaintiff's overtime shift.  (Def.'s Ex. B, Pl. Dep. at 116, 119.)  On July 18, 2002, Plaintiff filed a retaliation complaint with the PHRC against PNI, claiming that Rosato used Lombardo's password to delete his overtime shift.  (Def.'s Ex. B, Pl. Dep. at 120-22; Def.'s Ex. C, Pl. Dep. Ex. 6.)  Plaintiff also filed a complaint against Local 169 on the same grounds, alleging race discrimination.  (Def.'s Ex. C., Pl. Dep. Ex. 7.)  Plaintiff admits that he does not have evidence that Rosato changed his pay, but blames him because Lombardo was out on medical leave at the time of the incident.  (Def.'s Ex. B, Pl. Dep. at 122-23.)

Brennan, from PNI's human resources department, was assigned to respond to the late overtime complaint.  (Def.'s Ex. F, Brennan Dep. at 29.)  Brennan determined that the pay discrepancy in Plaintiff's paycheck had already been resolved and that there was no evidence to support the allegation that Rosato had tampered with the payroll system.  (Def.'s Ex. F, Brennan Dep. at 29; Def.'s Ex. D, Brown Dep. at 54-55, 58-59.)  She confirmed that Lombardo's password had not been used during the time frame of the alleged incident and another supervisor was responsible for payroll records during that period.  ( Def.'s Ex. E, Brennan Decl. ¶ 9 & Ex. 5 to Brennan Decl. (PNI's Answer and Position Statement).)  Rosato denied that he had access to PNI's payroll system.  (Def.'s Ex. H, Paul Rosato Dep. at 9-11.)

After the PHRC investigated Plaintiff's complaint and discussed it with him, on November 21, 2002, Plaintiff agreed voluntarily to withdraw this complaint.  (Def.'s Ex. B, Pl. Dep. at 153-54; Def.'s Ex. C, Pl. Dep. Ex. 9.)  PNI's human resource director, Christine Bonanducci, met with Rosato and Plaintiff to discuss the matter.  (Def.'s Ex. B, Pl. Dep. at 154-55.)  Plaintiff admits that he was satisfied with the resolution of the matter.  (Def.'s Ex. B, Pl. Dep. at 154-55.)


**D.      The Allegation That Plaintiff Brought A Gun Onto PNI's Premises Is Reported.**

On or about September 9, 2002, Robert Barron, Vice President of Employee Relations at PNI and in-house counsel, received a call from an employee, whom Barron knew but who wished to remain anonymous, reporting that Plaintiff had brought a gun into the PNI facility.  (Def.'s Ex. I, Barron Dep. at 7, 23-26, 71.)  Upon receiving the call, Barron contacted the Vice President of Human Relations, Charles Cammack, and the Director of Printing, James Brown.  (Def.'s Ex. I,

Barron Dep. at 30-31.)  Barron and Cammack appointed Bonanducci, the Human Resources

Director, to investigate the allegation.  (Def.'s Ex. I, Barron Dep. at 31.)  Because of the gravity

of the allegation, Barron, Brown, and Bonanducci decided to suspend Plaintiff with pay pending

the outcome of the investigation. (Def.'s Ex. D, Brown Dep. at 33, 35.)

On September 9, 2002, Brown called Plaintiff and informed him that someone had

reported seeing him inside the PNI facility with a handgun.  (Def.'s Ex. B, Pl. Dep. at 156.)

Plaintiff informed Brown that he did keep a gun in the glove compartment of his vehicle parked

in the parking lot, but did not bring it into the building.  (Def.'s Ex. B, Pl. Dep. at 157.)  Plaintiff

also told Brown that he believed the allegations were "paybacks" for filing a PHRC complaint

against the union.  (Def.'s Ex. B, Pl. Dep. at 157.)  Brown told Plaintiff that it was a violation of

PNI policy to have a gun anywhere on the premises, including PNI parking lots.  (Def.'s Ex. D,

Brown Dep. at 37.)  Brown suggested that Plaintiff visit the EAP, but Plaintiff refused.  (Def.'s

Ex. B, Pl. Dep. at 158.)  Brown informed Plaintiff that he was suspended with pay pending an

investigation.  (Def.'s Ex. B, Pl. Dep. at 158-59.)  Plaintiff remained on administrative

suspension with pay for nine days during the investigation.  (Def.'s Ex. B, Pl. Dep. at 158-59.)

Bonanducci interviewed employees who worked with Plaintiff on the third shift to

determine whether any had seen Plaintiff with a handgun.  (Def.'s Ex. B, Pl. Dep. at 181; Def.'s

Ex. C, Pl. Dep. Ex. 14; Def.'s Ex. D, Brown Dep. at 69; Def.'s Ex. J, Howlett Dep. at 11-12.)  In

addition to the anonymous caller, Marti stated that he had seen Plaintiff in the PNI facility with a

handgun.  (Def.'s Ex. I, Barron Dep. at 34; Def.'s Ex. K, Marti Dep. at 6-7.)  Marti stated that he

saw the gun inside of Plaintiff's bag, that Plaintiff picked it up and let Marti look at it, and that it

appeared to be a "32."  (Def.'s Ex. B, Pl. Dep. at 181; Def.'s Ex. C, Pl. Dep. Ex. 14; Def.'s Ex.

K, Marti Dep. at 6-7.)

Because only one employee stated unequivocally that he had seen Plaintiff with a gun inside PNI's facility, and because Plaintiff vehemently denied the allegation, Bonanducci, Barron, and Brown decided to give Plaintiff the benefit of the doubt and return him to work. (Def.'s Ex. B, Pl. Dep. at 166-68, 184-85; Def.'s Ex. I, Barron Dep. at 49.)  On September 17, 2002, Brown and Bonanducci met with Plaintiff and gave him a letter and a copy of PNI's weapon's policy.  (Def.'s Ex. B, Pl. Dep. at 162-63; Def.'s Ex. C, Pl. Dep. Ex. 11.)  The letter and weapon's policy stated that firearms and other deadly weapons were prohibited on PNI premises, including parking lots, and that any violation of the policy may lead to immediate termination.  (Def.'s Ex. C, Pl. Dep. Ex. 11.)  PNI returned Plaintiff to work without any deduction in pay, requirement to see PNI's psychiatrist or visit the EAP, or other discipline. (Def.'s Ex. B, Pl. Dep. at 166-67; Def.'s Ex. I, Barron Dep. at 35.)  Plaintiff now admits that he continued to bring his handgun onto PNI parking lots and keep it in his vehicle.  (Def.'s Ex. B, Pl. Dep. at 164-66.)

On February 12, 2003, Plaintiff received notice of the PHRC's decision, which did not find any discrimination relating to the December 18, 2001 incident with Gagliardi.  (Def.'s Ex. B, Pl. Dep. at 172-73.)  With the exception of an unreported incident about twenty years ago, Plaintiff could not identify another employee who was alleged to have brought a weapon onto PNI's property.  (Def.'s Ex. B, Pl. Dep. at 169-70.)

On February 19, 2003, Plaintiff filed a retaliation complaint against PNI regarding his nine-day suspension with pay.  (Def.'s Ex. B, Pl. Dep. at 175; Def.'s Ex. C, Pl. Dep. Ex. 13.)

**E.**      **Plaintiff's Tape-Recording Of A Conversation With Another PNI Employee.**

Several months after returning to work, Plaintiff claims that Marti was continuing to talk

about Plaintiff having a handgun on PNI premises.  (Def.'s Ex. B, Pl. Dep. at 186-87.)  Plaintiff

did not inform PNI's human resources problem about the continuing rumors.  (Def.'s Ex. B, Pl.

Dep. at 274.)  According to Plaintiff, he asked Marti why he was still talking about the incident,

and Marti claimed that another employee, Matt Rosato, was telling other employees that he had

seen Plaintiff with a handgun.[5]  (Def.'s Ex. B, Pl. Dep. at 186-87.)  Plaintiff did not believe that

Matt Rosato would say this, and decided surreptitiously to tape-record Marti making statements

about Matt Rosato.  (Def.'s Ex. B, Pl. Dep. at 187-88.)

On or about August 13, 2003, on PNI's premises Plaintiff tape-recorded a conversation

between himself and Marti without Marti's knowledge.  (Def.'s Ex. B, Pl. Dep. at 189-90.)  In

the tape-recording, Marti stated that Matt Rosato had said that he had seen Plaintiff with a

handgun.  (Def.'s Ex. B, Pl. Dep. at 189-90.)  The tape-recording also included Marti "trash-

talking" some of his co-workers.  (Def.'s Ex. K, Marti Dep. at 7.)

Plaintiff gave the tape-recording to his co-worker, Al Howlett, and asked him to give it to

Matt Rosato.  (Def.'s Ex. B, Pl. Dep. at 192.)  Howlett instead decided to give the tape to Paul

Rosato, Matt's brother and the union shop chairman.  (Def.'s Ex. J, Howlett Dep. at 22.)

Paul Rosato played the tape for Matt Rosato, who became upset that Plaintiff had secretly

tape-recorded a conversation with another employee.  (Def.'s Ex. H, Paul Rosato Dep. at 24;

Def.'s Ex. L, Matt Rosato Dep. at 15, 17, 21.)  Paul and/or Matt Rosato played the tape for Marti,

---

[5]  In his deposition, Matt Rosato testified that he saw Plaintiff with a handgun inside of
PNI's facility and that he shared this information with Marti.  (Def.'s Ex. L, Matt Rosato Dep. at
9-10, 12.)

who was also upset by it.  (Def.'s Ex. H, Paul Rosato Dep. at 25, 27; Def.'s Ex. L, Matt Rosato

Dep. at 17-18; Def.'s Ex. K, Marti Dep. at 15-16.)

The Rosatos then went to Brown, PNI's Printing Director, and told him that Plaintiff had

tape-recorded a conversation with Marti without Marti's knowledge.  (Def.'s Ex. D, Brown Dep.

at 39-40.)  They also told Brown that they, Marti, and other employees were upset about

Plaintiff's surreptitious tape-recording and that no one trusted Plaintiff anymore.  (Def.'s Ex. D,

Brown Dep. at 49; Def.'s Ex. H, Matt Rosato Dep. at 17, 20-21, 28; Def.'s Ex. H, Paul Rosato

Dep. at 28-29.)  Brown immediately called Barron, PNI's Vice President of Labor Relations, and

asked the Rosatos to repeat to Barron what they had told him.

Barron then decided to suspend Plaintiff without pay and with intent to terminate pending

an investigation because Barron believed that surreptitiously taping individuals was a felony in

Pennsylvania.  (Def.'s Ex. I, Barron Dep. at 39.)  Barron also made this decision because he

believed that surreptitious tape-recording by an employee was damaging to a cohesive workforce

and violated the trust between employees and between an employer and employee.  (Def.'s Ex. I,

Barron Dep. at 39.)

On August 15, 2003, Brown called Plaintiff and informed him that he was suspended

without pay pending an investigation.  (Def.'s Ex. B, Pl. Dep. at 196.)  Brown informed Plaintiff

that he had received complaints from employees that Plaintiff had made tape-recordings and was

making employees nervous.  (Def.'s Ex. B, Pl. Dep. at 196.)  Brown told Plaintiff that PNI would

hold a meeting with Plaintiff and his union representative, but that due to vacation plans, a

meeting would not take place for at least ten days.  (Def.'s Ex. B, Pl. Dep. at 196-97.)

Brennan investigated the taping incident.  (Def.'s Ex. D, Brown Dep. at 45; Def's Ex. F,

Brennan Dep. at 37, 48.)  She received and listened to a copy of the tape, and met with Marti and

Paul Rosato.  (Def.'s Ex. F, Brennan Dep. at 37, 48.)  Marti confirmed that his and Plaintiff's

voices were on the tape, and that the tape-recording was made without Marti's knowledge or

permission.  (Def.'s Ex. I, Barron Dep. at 40; Def.'s Ex. E, Brennan Decl. ¶ 10 & Ex. 6 to

Brennan Decl. (Interview notes with Santiago Marti).)  Marti provided a written statement to the

same effect.  (Def.'s Ex. K, Marti Dep. at 21-24 & Ex. 1 to Marti Dep.)

        Following Brennan's investigation, Brown sent Plaintiff a letter, dated October 8, 2003,

informing him that his actions subjected him to immediate termination.  (Def.'s Ex. B, Pl. Dep.

at 195; Def.'s Ex. C, Pl. Dep. Ex. 16.)  The letter explained that making the tape-recording was

inconsistent with Plaintiff's duties at PNI, undermined his ability to work with his co-workers,

and was illegal.  (Def.'s Ex. C, Pl. Dep. Ex. 16.)  The letter stated that Plaintiff's termination

would be not be finalized until October 17, 2003 and provided Plaintiff the opportunity to present

any facts that could impact PNI's final decision.  (Def.'s Ex. C, Pl. Dep. Ex. 16.)

        On October 16, 2003, PNI held a grievance meeting with Plaintiff and Local 169.  (Def.'s

Ex. B, Pl. Dep. at 203; Def.'s Ex. D, Brown Dep. at 47.)  At the meeting, Plaintiff admitted that

he made the tape-recording.  (Def.'s Ex. B, Pl. Dep. at 203.)  Barron and Brown then informed

Plaintiff that he was terminated.  (Def.'s Ex. D, Brown Dep. at 47.)  Brown testified that Plaintiff

was fired because taping someone without their permission was a felony in Pennsylvania and

because Plaintiff's actions disrupted the work environment and employees were nervous about

working with him.  (Def.'s Ex. D, Brown Dep. at 47-78.)

        Plaintiff does not know of any other PNI employee who has tape-recorded a conversation

with another employee without that employee's knowledge.  (Def.'s Ex. B, Pl. Dep. at 197.)

On September 20, 2005, Plaintiff filed an amended complaint with the PHRC, amending his earlier retaliation complaint regarding his suspension with pay to add a retaliation count challenging his termination.  (Def.'s Ex. B, Pl. Dep. at 230; Def.'s Ex. C, Pl. Dep. Ex. 20.) Plaintiff claims that his termination was discriminatory because other Caucasian employees, including Gagliardi, Brian Reice, and Paul Rosato, committed more serious wrongs and were not terminated.  (Def.'s Ex. B, Pl. Dep. at 235-36, 328.)  Plaintiff contends that Gagliardi, who received a thirteen-day suspension without pay for his verbal altercation with Plaintiff, should have been terminated.  Plaintiff reported that Reice did not return to work after his lunch break, and Reice was given a written warning by Seixas.  (Def.'s Ex. B, Pl. Dep. at 104-05; Def.'s Ex. C, Pl. Dep. Ex. 4 (Formal Warning Report issued to Reice, dated May 16, 2001).)  Plaintiff's contentions with respect to Paul Rosato stem from Plaintiff's assertion that he deleted Plaintiff's overtime.  (Def.'s Ex. B, Pl. Dep. at 238.)

### G.      The Arbitration.

On December 9, 2003, Local 169 submitted a request for arbitration of Plaintiff's discharge.  (Def.'s Ex. C, Pl. Dep. Ex. 4.)  On October 24, 2004, the arbitration was held.  (Def.'s Ex. B, Pl. Dep. at 204.)  On December 21, 2004, the arbitrator upheld Plaintiff's discharge, concluding that Plaintiff's secret tape-recording of a fellow employee caused great disruption in the work environment.  (Def.'s Ex. B, Pl. Dep. at 207; Def.'s Ex. C, Pl. Dep. Ex. 4.)  Plaintiff received notice of the arbitrator's decision on January 21, 2005.

Defendant offers what it considers to be after-acquired evidence independently justifying Plaintiff's termination, which Plaintiff disputes without offering an explanation or contradicting

evidence.  Defendant contends that after Plaintiff's termination and before the arbitration, Reice

came forward to corroborate that he had seen Plaintiff inside PNI's facility with a handgun.

(Def.'s Ex. I, Barron Dep. at 52-53; Def.'s Ex. C, Pl. Dep. Ex. 21.)  Defendant also contends that,

during his deposition, Plaintiff admitted to taking documents out of other employees' personnel

files without authorization, (Def.'s Ex. B, Pl. Dep. at 96-100, 103-04), and continuously violating

PNI's gun prohibition, (Def.'s Ex. B., Pl. Dep. 163-66).


**H.      Procedural History.**

On October 11, 2005, Plaintiff filed a Complaint in this court against Defendants PNI and

Local 169.  In March 2006, the case was referred to mediation.  Plaintiff and Local 169 entered

into a settlement agreement and, on March 15, 2006, the case was dismissed and terminated as to

Local 169 only.

On August 29, 2006, Plaintiff filed an Amended Complaint against Defendants PNI and

Local 169, even though Local 169 had been terminated as a party.  Count IV of the Amended

Complaint was only brought against Local 169.  On November 2, 2006, the court granted

Defendant Local 169's Motion to Strike Plaintiff's Amended Complaint and Enforce Settlement

Agreement, thereby terminating Local 169 from the case.

On September 18, 2007, the parties filed a stipulation to dismiss Counts II, V, and VI of

the Amended Complaint.  The court entered an order dismissing those counts on September 19,

2007.  The only counts currently remaining are Count I (42 U.S.C. § 1981) and Count III

(Pennsylvania Human Relations Act, 43 Pa.C.S. § 951, et seq.).

### III.  Legal Standard for Summary Judgment

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the moving party is

entitled to a summary judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322

(1986); Fed. R. Civ. P. 56(c).  In order to defeat a motion for summary judgment, disputes must

be both (1) material, meaning concerning facts that will affect the outcome of the issue under

substantive law, and (2) genuine, meaning the evidence must be such that a reasonable jury could

return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986).  Summary judgment is mandated "against a party who fails to make a showing sufficient

to establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial." Celotex, 477 U.S. at 322-23.  In reviewing a motion for

summary judgment, the court "does not make credibility determinations and must view facts and

inferences in the light most favorable to the party opposing the motion." Seigel Transfer, Inc. v.

Carrier Express, Inc., 54 F.3d 1125, 1127 (3d Cir. 1995).  The United States Court of Appeals for

the Third Circuit does not distinguish between claims under federal and Pennsylvania law, as the

standards for determining summary judgment motions are the same.  Jones v. Sch. Dist. of Phila.,

198 F.3d 403, 409 (3d Cir. 1999).

### IV.  Discussion

Plaintiff claims that the following of Defendant's acts were discriminatory: (1) the

removal of his "added responsibility" function and (2) his termination.  (Pl.'s Mem. at 12.)  He

concedes that a suspension with pay does not constitute an adverse employment action for purposes of a discrimination claim.  (Pl.'s Mem. at 12 n.2.)

Plaintiff claims that all of the actions taken by Defendant after Plaintiff filed his first PHRC complaint on March 5, 2002 were retaliatory, namely: (1) the missing overtime payment; (2) the nine-day suspension with pay during the alleged gun incident investigation; (3) the suspension without pay during the alleged surreptitious tape-recording incident investigation; and (4) his termination.  (Pl.'s Mem. at 12, 15.)

The court first considers whether some of Plaintiff's PHRA claims are procedurally barred.  Next, the court considers whether Plaintiff has established a prima facie case of discrimination and/or retaliation and, if so, whether Plaintiff has established that PNI's reasons for its actions were a pretext for discrimination and/or retaliation.

**A.   Some of Plaintiff's PHRA Claims Are Procedurally Barred.**

Defendant argues that the following PHRA claims fail as a matter of law because exhaustion and statute of limitations requirements are not met: (1) both of Plaintiff's discrimination claims related to his removal of "added responsibility" function and termination, and (2) two of his retaliation claims related to his suspension without pay and termination. Plaintiff appears to concede that these PHRA claims are procedurally barred and does not refute Defendant's arguments.  (See Pl.'s Mem. 3 n.1 ("[B]ecause all of [Plaintiff's] PHRA claims are encompassed within his Section 1981 claims, whatever administrative failures or statute of limitations violations may exist with respect to his PHRA claims are irrelevant to the ultimate disposition of Defendant's Motion for Summary Judgment and they will not be addressed in this

Memorandum.").)

To bring an action under the PHRA, a plaintiff must first file an administrative complaint with the PHRC within 180 days after the alleged act of discrimination or retaliation.  43 Pa.C.S. §§ 959(a) & (h), 962.  If the administrative complaint of discrimination is not timely filed and/or administrative remedies are not exhausted, the PHRA claim must be dismissed.  Woodson v. Scott Paper Co., 109 F.3d 913, 925 (3d Cir. 1997).  A plaintiff must file in court any PHRA claim within two years after the date of notice of the conclusion of the PHRC investigation.  43 Pa.C.S. § 962(c)(2).

Defendant first argues that Plaintiff's PHRA claims regarding his termination fail as a matter of law because he did not file with the PHRC a complaint related to his termination within 180 days of his termination.  It is undisputed that Plaintiff was terminated from his employment with PNI on October 17, 2003 and did not file a complaint with the PHRC related to his termination until September 15, 2005.  Moreover, Plaintiff's PHRC termination claim alleged only retaliation, and not discrimination based on race.  Nor did his PHRC termination claim include mention of his suspension without pay during the alleged surreptitious tape-recording incident investigation, a claim that he now attempts to bring under the PHRA.  Because Plaintiff failed to exhaust timely his administrative remedies with the PHRC, Plaintiff's PHRA discrimination and retaliation claims regarding his termination and retaliation claim regarding his suspension without pay fail as a matter of law.  See Woodson, 109 F.3d at 925.

Second, Defendant argues that Plaintiff's PHRA claim regarding the removal of his "added responsibility" function fails as a matter of law because he did not file his federal court complaint within two years of the PHRC's dismissal of his complaint.  It is undisputed that the

PHRC dismissed Plaintiff's PHRC complaint related to the removal of the "added responsibility" function, finding in PNI's favor, on March 13, 2003, but did not file his federal court complaint until over two years later, on October 11, 2005.  Plaintiff's PHRA discrimination claim regarding the removal of his "added responsibility" function is therefore time-barred.  See 43 Pa.C.S. § 962(c)(2).

Defendant does not argue that Plaintiff's retaliation claims for his late overtime payment and nine-day suspension with pay during the alleged gun incident investigation are procedurally barred.  The court will consider these two remaining PHRA claims below, as they overlap with Plaintiff's 42 U.S.C. § 1981 claims.  To the extent that any other of Plaintiff's PHRA claims are not procedurally barred, they are also considered below.

**B.      Plaintiff Fails To Establish A Prima Facie Case Of Discrimination Or Retaliation.**

Because Plaintiff does not present direct evidence of race discrimination or retaliation, the parties do not dispute that his discrimination and retaliation claims under Section 1981[6] and the PHRA are governed by the burden-shifting framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  See Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir.

---

[6]  The United States Supreme Court granted certiorari and recently heard argument for a Seventh Circuit case, Humphries v. CBOCS West, Inc., 474 F.3d 387 (7th Cir. 2007), cert. granted, 128 S. Ct. 30 (Sept. 25, 2007), on the issue of whether retaliation is a recognizable claim under § 1981.  See id. at 410 (Easterbrook, J. dissenting) (arguing that because § 1981 does not contain an anti-retaliation rule, the majority's opinion had impermissibly expanded § 1981 to have the same substantive content as Title VII but without Title VII's procedural regulations). As the Third Circuit has implicitly recognized retaliation claims under § 1981, see, e.g., Cardenas v. Massey, 269 F.3d 251, 263-64 (3d Cir. N.J. 2001), and absent a decision from the Supreme Court on the issue, this court will continue to follow the Third Circuit's position in recognizing Plaintiff's retaliation claims under § 1981.

1999).  Under this burden-shifting framework, Plaintiff first must establish by a preponderance of the evidence a prima facie case of discrimination and/or retaliation.  Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-253 (1981); McDonnell Douglas, 411 U.S. at 802.  If Plaintiff succeeds in establishing a prima facie case, the burden shifts to Defendant to articulate a legitimate, non-discriminatory reason for the prohibited conduct.  Id.  If Defendant carries this burden of production, Plaintiff must then persuade the court by a preponderance of the evidence that the employer's reason is pretextual.  Id.; Jones, 198 F.3d at 410.

**1.      Plaintiff Fails To Establish A Prima Facie Case Of Discrimination.**

To establish a prima facie case of discrimination, Plaintiff must show that: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) nonmembers of the protected class were treated more favorably or other circumstances are present that give rise to an inference of unlawful discrimination.  Jones, 198 F.3d at 410-11; Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 522 (3d Cir. 1992).  Defendant only disputes the fourth prima facie case requirement for discrimination.

***a.      Plaintiff Fails To Establish That Similarly Situated Nonmembers Of The Protected Class Were Treated More Favorably Or Otherwise Raise An Inference Of Discrimination.***

Defendant argues that Plaintiff's discrimination claims related to the removal of his "added responsibility" function and his termination fail as a matter of law because he cannot establish that similarly situated persons outside of his protected class were treated more favorably than him or otherwise establish an inference of unlawful discrimination.

### I.      Plaintiff's Removal Of "Added Responsibility" Function Claim.

Plaintiff concedes that he cannot rely on comparator evidence for his removal of "added responsibility" function claim.[7]  He instead argues that the circumstances of the removal of his "added responsibility" function give rise to an inference of race discrimination.  He characterizes himself as an "innocent victim" of Gagliardi's conduct and argues that he was penalized financially by the removal of his "added responsibility" function, even though PNI credited his version of events.  He believes that other employees were jealous of him because he earned additional income as both a control room operator and employee with additional responsibilities.  He further argues that Friel, a Caucasian male, was trained in the "added responsibility" position after the "added responsibility" function was removed from Plaintiff.

Plaintiff ignores the undisputed evidence that PNI never held him entirely blameless, but rather believed that Plaintiff should not have escalated the incident by stating, "don't bother, I'm right behind you," and following Gagliardi outside.  In reacting in this manner, Plaintiff was no longer an "innocent victim."  PNI temporarily removed Plaintiff's "added responsibility" function because it believed that Plaintiff did not handle the situation well and wanted to ensure that the incident between Plaintiff and Gagliardi did not repeat itself or escalate.  That other employees may have been jealous of Plaintiff's additional income does not impute any discriminatory motive to PNI management.  Furthermore, Friel did not replace Plaintiff in the

---

[7]  Nor could he, as he has failed to identify any other PNI employee with the "added responsibility" function who engaged in a confrontation similar to Plaintiff's with Gagliardi, and the only other employee who could be considered a comparator, Gagliardi, who did not have the "added responsibility" function, received a more severe penalty than Plaintiff.

additional responsibility function.  Instead, a manager was transferred to the third shift so that a union employee would not have to take on the "added responsibility" function.  Friel worked the "added responsibility" function occasionally, when the manager was on vacation or otherwise unavailable.

Moreover, Plaintiff admits that no PNI employee ever directed a racial statement toward him.  He alleges that Marti told him that Friel called Plaintiff a racial slur, but there is no evidence that this was reported to PNI management.  Assuming that Friel made the comment, it does not support an inference of discrimination by PNI because the non-supervisory employee making the comment was not a decision-maker in relation to any of the actions of which Plaintiff complains.  See Ezold, 983 F.2d at 545 ("Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision.").  Plaintiff has not offered in support of his removal of "added responsibility" function claim any evidence that gives rise to a reasonable inference of unlawful discrimination.  Thus, Plaintiff's removal of "added responsibility" function claim fails as a matter of law.

### ii.     *Plaintiff's Termination Claim.*

Plaintiff raises three arguments to try to support his claim that his termination raises an inference of discrimination: (1) Defendant did not have a policy prohibiting the conduct for which he was terminated; (2) three Caucasian employees engaged in comparable behavior and were not terminated; and (3) his replacement by Matt Rosato raises an inference of discrimination.

First, Plaintiff argues that his termination raises an inference of discrimination because Defendant has not produced a policy explicitly prohibiting the tape-recording of another employee without his or her knowledge or consent.  However, under Pennsylvania's Wiretapping and Electronic Surveillance Control Act, it cannot be disputed that the tape-recording of a conversation with another individual without that individual's consent is a felony of the third degree.[8]  See 18 Pa.C.S. § 5703.

Plaintiff essentially argues that even so, before an employee can be terminated for committing a felony, each and every felony must be specifically proscribed in a company's policy.  This argument is patently absurd.  Although the policy here does prohibit some criminal conduct, such as theft and defacing of company property, it defies common sense to contend that every felonious act must be listed in the company policy to be available for termination purposes. (See Def.'s Ex. C, Pl. Dep. Ex. 3.)  Felonious conduct committed on the company's premises would be understood as conduct unbecoming an employee.

Nevertheless, PNI made known to Plaintiff that his conduct had violated the policy's

---

[8]  The Wiretapping and Electronic Surveillance Control Act provides:
Except as otherwise provided in this chapter, a person is guilty of a felony of the third degree if he:
(1) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept any wire, electronic or oral communication;
(2) intentionally discloses or endeavors to disclose to any other person the contents of any wire, electronic or oral communication, or evidence derived therefrom, knowing or having reason to know that the information was obtained through the interception of a wire, electronic or oral communication; or
(3) intentionally uses or endeavors to use the contents of any wire, electronic or oral communication, or evidence derived therefrom, knowing or having reason to know, that the information was obtained through the interception of a wire, electronic or oral communication.
18 Pa.C.S. § 5703.

Employee Relations provision for engaging in behavior that was disruptive to the work

environment.  (See Def.'s Ex. C, Pl. Dep. Ex. 3 (company policy); Def.'s Ex. C, Pl. Dep. Ex. 16

(PNI letter to Plaintiff dated Oct. 8, 2003); Def.'s Ex. D, Brown Dep. at 47-48.)  The Employee

Relations section of PNI's policy provides:

> All acts of threats of physical violence and *other disruptive actions* including
> sexual harassment or any form of discrimination are strictly prohibited.  In
> addition *any action* that may cause harm either directly or indirectly to another
> employee or that interfere [sic] with the operation of equipment and/or machinery
> or that may directly impact the overall operation, are [sic] strictly prohibited.

(Def.'s Ex. C, Pl. Dep. Ex. 3 (emphasis added).)  Plaintiff's argument that his termination raises

an inference of discrimination because Defendant has not produced a policy explicitly prohibiting

surreptitious tape-recording is therefore entirely without merit.

Second, Plaintiff argues that three Caucasian employees, Gagliardi, Reice, and Paul

Rosato, engaged in comparable behavior and were not terminated.  According to Plaintiff,

Gagliardi was not fired for challenging Plaintiff to a fight; Reice was not fired for failing to

return to work because he was intoxicated; and Paul Rosato was not fired for tampering with

Plaintiff's paycheck by deleting an overtime shift.  Plaintiff asserts, without providing any legal

support, that whether the conduct of Gagliardi, Reice, and Paul Rosato was comparable to

Plaintiff's conduct is a jury issue.

Contrary to Plaintiff's argument, this court has authority to determine whether Plaintiff

has established a prima facie case, including whether Plaintiff has presented evidence that

similarly situated nonmembers of the protected class were treated more favorably than Plaintiff.

Pivirotto v. Innovative Sys., 191 F.3d 344, 348 n.1 (3d Cir. 1999) ("The determination of

whether a prima facie case has been made out is a legal one for the court.").  To be considered

"similarly situated," a plaintiff must "prove that all of the relevant aspects of his employment situation are nearly identical to those of the . . . employees whom he alleges were treated more favorably." Miller v. Del. Dep't of Probation & Parole, 158 F. Supp. 2d 406, 411 (D. Del. 2001) (citation omitted); see Anderson v. Haverford College, 868 F. Supp. 741, 745 (E.D. Pa. 1994) (holding that, to be deemed similarly situated, a plaintiff must show that he and the other individual "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish his conduct or the employer's treatment of them for it" (citation omitted)).

After reviewing the evidence in the light most favorable to Plaintiff, the court finds that Plaintiff has failed to show that Gagliardi, Reice, and Paul Rosato engaged in comparable behavior. None of these three employees surreptitiously tape-recorded a conversation with another employee or committed a felony. Therefore, Plaintiff implicitly concedes that he cannot identify any other PNI employee who tape-recorded a conversation without that employee's consent or any PNI employee who committed a felony who was not terminated.

Gagliardi was involved in a verbal altercation with Plaintiff, for which Gagliardi was commensurately disciplined by being suspended without pay for thirteen days. Gagliardi's conduct simply does not compare to Plaintiff's surreptitious tape-recording of a co-worker, which constituted a third degree felony and disrupted the work environment in Plaintiff's department, (see, e.g., Def.'s Ex. D, Brown Decl. at 48).

Plaintiff reported that Reice failed to return to work after a lunch shift, and alleges that he did not return because he became intoxicated over his lunch hour. (Def.'s Ex. B, Pl. Dep. at 104-05.) With the exception of a hearsay statement made to Plaintiff by a co-worker that Reice was vomiting in the bathroom, Plaintiff presents no evidence that Reice was intoxicated. (Def.'s Ex.

B, Pl. Dep. at 104-05.)  This allegation is inadmissible hearsay and is insufficient to establish an

inference of discrimination.  See Fed. R. Civ. P. 56(e)(2) ("When a motion for summary

judgment is properly made and supported, an opposing party may not rely merely on allegations

or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided

in this rule – set out specific facts showing a genuine issue for trial.").  Again, although failure to

complete a shift is inappropriate conduct, for which Reice received a written warning, it is not

comparable to the surreptitious tape-recording of a co-worker, which constitutes felonious

conduct and has disruptive consequences.  Moreover, as Defendant correctly points out, Seixas

was the supervisor who made the decision to give Reice a written warning, and Seixas was not

involved in the decision to terminate Plaintiff.  "[W]hen employment decisions concerning

different employees are made by different supervisors, such decisions are seldom sufficiently

comparable to raise an inference of discrimination because different supervisors may exercise

their discretion differently."  Taylor v. Procter & Gamble Dover Wipes, 184 F. Supp. 2d 402, 410

(D. Del.), aff'd, 53 Fed. Appx. 649 (3d Cir. 2002).  Therefore, Reice is not similarly situated to

Plaintiff.

As to Paul Rosato, Plaintiff's claim that he deleted Plaintiff's overtime shift from the

payroll system by using Lombardo's password is unsubstantiated.  After investigation, PNI

determined that no one had tampered with the payroll system and that Lombardo's password was

not used during that period.  Plaintiff has not presented any evidence in rebuttal.  Plaintiff's

allegations as to Paul Rosato therefore do not support an inference of discrimination.  See Fed. R.

Civ. P. 56(e)(2).  Paul Rosato is not similarly situated to Plaintiff.

Finally, Plaintiff contends that Defendant's explanation that Plaintiff was replaced by

Matt Rosato as control room operator through the seniority system and normal bidding process is

not credible, and is relevant to whether the circumstances surrounding Plaintiff's termination

permit an inference of discrimination.  Defendant explains that vacancies at PNI are filled

through a seniority bidding process.  (Def.'s Ex. C, Pl. Dep. Ex. 4 (Seniority provision); Def.'s

Ex. M, Brown Decl. at ¶3.)  Matt Rosato was already working as a paperhandler on the second

shift and occasionally worked as a control room operator.  (Def.'s Ex. L, Matt Rosato Dep. at 6;

Def.'s Ex. M, Brown Decl. at ¶4.)  Defendant explains that, after Plaintiff was terminated, Matt

Rosato was transferred to the third shift as a paperhandler/control room operator because he was

the most senior employee interested in the position.  (Def.'s Ex. M, Brown Decl. at ¶4.)

Defendant therefore argues that because Matt Rosato was transferred based on seniority and in

accordance with the terms of the collective bargaining agreement, his transfer does not support

an inference of discrimination.[9]

Plaintiff argues that the only support for Defendant's explanation is the Declaration of

Jim Brown, which Plaintiff argues is self-serving and not credible.  Plaintiff argues that the

determination of credibility is an issue for the jury to decide.  Plaintiff, however, fails to provide

any evidence to rebut Brown's Declaration.  He therefore fails to establish by a preponderance of

---

[9]  Defendant further argues no such inference can be drawn because the only new
paperhandlers hired into Plaintiff's former department in the fifteen months following his
termination were one African-American male and one Caucasian male, (Def.'s Ex. M, Brown
Decl. at ¶5).  See Koyejo v. CIGNA Corp., No. 90-cv-7378, 1991 U.S. Dist. LEXIS 16239, at
*16-17 (E.D. Pa. Nov. 5, 1991) ("Because another black employee filled one of three managerial
positions, plaintiff has not met his burden of showing that he did not receive a managerial
position because of his race. While a white male received the position for which he had been
recommended, a black employee did receive an equivalent position equal in pay and status.").
Defendant, however, has not provided evidence that the African-American employee received an
equivalent position, equal in pay and status, to Plaintiff's former position as paperhandler and
control room operator.

the evidence that Plaintiff's replacement by Matt Rosato as paperhandler/control room operator did not follow the collective bargaining agreement provisions.

Plaintiff has failed to show that his termination raises an inference of unlawful discrimination.  His discrimination claim related to his termination therefore fails as a matter of law.

### 2.      Plaintiff Fails To Establish A Prima Facie Case Of Retaliation.

To establish a prima facie case of retaliation, Plaintiff must show: "(1) protected employee activity; (2) adverse employment action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal relationship between the employee's protected activity and the employer's adverse action."  Marra v. Phila. Hous. Auth., 497 F.3d 286, 300 (3d Cir. 2007) (quotation omitted).  Defendant only disputes the second and third prima facie case requirements for retaliation.

### a.      Plaintiff Fails to Establish An Adverse Action As To His Late Overtime And Suspension With Pay Claims.

Defendant argues that Plaintiff's retaliation claims related to his late overtime and suspension with pay fail as a matter of law because they are not adverse employment actions. Defendant does not argue that Plaintiff's retaliation claims related to his suspension without pay followed by his termination are not adverse employment actions.

To satisfy the adverse employment action requirement for a prima facie case of retaliation, "a plaintiff must show that a reasonable employee would have found the challenged

action materially adverse, which . . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington Northern & Santa Fe Ry. v. White, 548 U.S. 53, 68 (2006) (quotations and citation omitted).  "[P]etty slights, minor annoyances, and simple lack of good manners" that often occur in the workplace do not normally constitute materially adverse employment actions. Id.  "Context matters" in determining whether a challenged act would have dissuaded a reasonable employee from making or supporting a charge of discrimination, and an "act that would be immaterial in some situations is material in others." Id. at 69 (quotation omitted).  Without any elaboration or support, Plaintiff cursorily argues that his suspension with pay and the late overtime payment, in the context in which they occurred, would have dissuaded a reasonable employee from making or supporting a charge of discrimination.

First, Plaintiff's one-week delay in receiving pay for a single overtime shift in July 2002 does not constitute an adverse employment action.  See Sharp v. Continental Express Airlines, Inc., No. 98-cv-3818, 2000 U.S. Dist. LEXIS 1431, at *20 (E.D. Pa. Feb. 3, 2000) (finding that short delays in receiving pay do not constitute adverse employment actions for retaliation purposes).  Plaintiff's allegation that a non-management union employee deleted a payroll shift from his payroll record was not substantiated by a thorough investigation, which found that the password Plaintiff claimed had been used was not actually used during that period.  Even if true, the alleged action was not taken by PNI.  Further, it is undisputed that when Plaintiff reported that his overtime payment was missing, PNI management took prompt action to ensure that it was included in his next weekly paycheck.  Because the alleged action was not taken by PNI and PNI promptly corrected it, the late overtime payment, although it may have been an annoyance,

would not have dissuaded a reasonable employee from making or supporting a charge of discrimination.

Second, courts have held that a suspension with pay pending a prompt investigation into allegations of wrong-doing does not constitute an adverse employment action.  See Helmi v. Solvay Pharms., Inc., No. 5:05-CV-36, 2006 U.S. Dist. LEXIS 84562, at *35-36, 38-39, 45-46 (W.D. Mich. Nov. 21, 2006) (finding that a two-day suspension with pay did not constitute an adverse employment action for retaliation purposes, post-Burlington Northern, 548 U.S. 53); Singletary v. Mo. Dep't of Corr., 423 F.3d 886, 889, 891-892 (8th Cir. 2005) (concluding that a suspension with pay and benefits for eighty-nine days did not constitute an adverse action for retaliation purposes); Peltier v. United States, 388 F.3d 984, 988 (6th Cir. 2004) ("[A] suspension *with* pay and full benefits pending a timely investigation into suspected wrongdoing is not an adverse employment action."); Breaux v. City of Garland, 205 F.3d 150, 158, 164 (5th Cir. 2000) (holding that a suspension with pay does not constitute an adverse employment action); Rose v. Buckeye Telesystem, Inc., 181 F. Supp. 2d 772, 776 (N.D. Ohio 2001) (finding that a written warning and one-day suspension with pay did not constitute adverse employment actions).  Plaintiff's nine-day suspension with full pay and benefits, starting on September 9, 2002, pending PNI's prompt investigation into whether Plaintiff had brought a handgun onto PNI property, would not have dissuaded a reasonable employee from making or supporting a charge of discrimination.

Plaintiff's attempt to link his suspension with pay and late overtime payment to the broader context of his suspension without pay in August 2003 and termination in October 2003 in order to establish that they are adverse actions is unavailing.  Plaintiff's suspension without

pay and termination arising out of the surreptitious tape-recording incident occurred about one year after his late overtime payment and suspension with pay and derive from separate chains of events.  The court has considered each alleged retaliatory act in its context, both individually and as a group.  Plaintiff's retaliation claims related to his late overtime payment and suspension with pay fail as a matter of law because they do not constitute adverse employment actions.

### b.       Plaintiff Fails to Establish A Causal Connection.

Even if Plaintiff's late overtime payment and suspension with pay constitute adverse actions, Defendant argues that all of Plaintiff's retaliation claims, related to the late overtime payment, the nine-day suspension with pay, the suspension without pay, and his termination, fail because Plaintiff cannot establish a causal connection between his protected activity and any of his alleged adverse employment actions.

To show a causal connection between the employee's protected activity and the employer's adverse action, a plaintiff may rely on a "broad array of evidence."  Marra, 497 F.3d at 302.  An "unusually suggestive proximity in time between the protected activity and the adverse action may be sufficient, on its own, to establish the requisite causal connection," but "the mere passage of time is not legally conclusive proof against retaliation."  Id. (quotations, citations, and alterations omitted).  The Third Circuit has explained:

> Where the time between the protected activity and the adverse action is not so close as to be unusually suggestive of a causal connection standing alone, courts may look to the intervening period for demonstrative proof, such as actual antagonistic conduct or animus against the employee, . . . or other types of circumstantial evidence, such as inconsistent reasons given by the employer for terminating the employee or the employer's treatment of other employees, that give rise to an inference of causation when considered as a whole.

Id. (citations omitted).

Plaintiff argues that the timing of events establishes a causal connection, in that all of the retaliatory acts of which he complains occurred in the nineteen months following his first PHRC complaint in March 2002.  However, the proximity of the alleged retaliatory events occurring over those nineteen months to the protected activity is not "unusually suggestive."  See id.  That Plaintiff filed complaints with the PHRC before the claimed retaliatory acts occurred is not enough alone to establish a causal connection.  See id.

Plaintiff then argues in a conclusory manner that, regardless of the temporal proximity, the evidence demonstrates a pattern of antagonism toward him.  This argument fails for several reasons.  First, Plaintiff alleges that the late overtime payment was caused by the actions of a non-management union employee and admits that PNI corrected the problem as soon as Plaintiff reported it.  The late overtime payment therefore does not have any causal connection to the protected activity.

Second, Plaintiff does not offer any evidence to link his nine-day suspension with pay during PNI's investigation of the alleged gun incident, which was prompted by an anonymous call, with the protected activity.  There is no evidence that PNI instigated or fabricated the anonymous call so as to conduct an investigation designed to harass or intimidate Plaintiff.  Instead, PNI conducted a balanced investigation, ultimately gave Plaintiff the benefit of the doubt, and permitted him to return to work without any negative consequences.  Thus, Plaintiff fails to establish a causal connection between his suspension with pay and the protected activity.

Finally, Plaintiff admitted to the conduct that resulted in his suspension without pay and his termination for surreptitiously tape-recording another employee, and has failed to produce

any evidence that any other employee was disciplined disparately for similar conduct.  Plaintiff

fails to show a causal connection between his PHRC complaints and his suspension without pay

and termination.  Plaintiff's retaliation claims therefore fail as a matter of law.

C.     **Plaintiff Fails To Establish That Defendant's Reasons Were Pretext For Discrimination Or Retaliation.**

Lastly, Defendant argues that, even if Plaintiff can establish a prima facie case, all of

Plaintiff's race discrimination and retaliation claims fail as a matter of law because Plaintiff

cannot establish that PNI's proffered legitimate, nondiscriminatory reasons for its actions were a

pretext for discrimination or retaliation.

To establish pretext, the plaintiff must show by a preponderance of the evidence that the

employer's articulated reasons are false and that the discrimination or retaliation was the "real

reason for the adverse employment action."  Marra, 497 F.3d at 300-01 (quotation omitted).  "[A]

plaintiff's prima facie case, combined with sufficient evidence to find that the employer's

asserted justification is false, may permit the trier of fact to conclude that the employer

unlawfully discriminated" or retaliated.  Reeves v. Sanderson Plumbing Prods., 530 U.S. 133,

148 (2000); Marra, 497 F.3d at 306.  A plaintiff may show pretext by exposing "such

weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's

proffered legitimate reasons for its action that a reasonable factfinder could rationally find them

unworthy of credence."  Marra, 497 F.3d at 306 (quotation omitted).  It is not enough to show

that "the employer's decision was wrong or mistaken, since the factual dispute at issue is whether

discriminatory animus motivated the employer."  Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir.

1994).

For both his race discrimination and retaliation claims, Plaintiff does not present any additional evidence or arguments to establish pretext.  (See Pl.'s Mem. 12, 17.)  He relies on the same evidence to establish pretext as that relied on for his prima facie case.  (See id.)  The court has addressed all of the arguments raised and evidence presented with respect to Plaintiff's prima facie case for discrimination and retaliation.  The court's findings apply with equal force with respect to pretext and are incorporated herein.

Plaintiff's claims that PNI was biased against him because of his race is further undercut by PNI's crediting of Plaintiff's version of events as to both the incident involving Gagliardi and the alleged gun incident.  For all purposes prior to the surreptitious tape-recording incident, Plaintiff's word had been taken over that of non-African-American employees.  With respect to the tape-recording incident, it is undisputed that Plaintiff admitted that he did it.

Even if Plaintiff were able to establish a prima facie case, he has failed to produce any evidence that raises even a reasonable inference that PNI's reasons for the removal of his "added responsibility" function and his termination were pretextual or unworthy of credence, or that would demonstrate that race discrimination was more likely than not a determinative factor underlying these actions.  Nor has Plaintiff produced any evidence that would discredit PNI's reasons for his late overtime payment, suspension with pay during the alleged gun incident investigation, suspension without pay during the tape-recording incident investigation, and termination, or that would otherwise demonstrate that PNI took these actions to retaliate against him.  Plaintiff's race discrimination and retaliation claims all fail as a matter of law.

## V.  Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment is granted.

An appropriate Order follows.